UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

*ex. rel.* HILDA BULKU,

        Relator,

v.

        Case No. 8:16-cv-1261-T-24 JSS

LINCARE HOLDINGS, INC.,

        Defendant.
_____/

**ORDER**

This cause comes before the Court on Defendant's Motion to Dismiss. (Doc. No. 68). Relator opposes the motion. (Doc. No. 71). The Court held a hearing on this motion on November 16, 2020, and the parties submitted hearing briefs (Doc. No. 81, 82). As explained below, the motion is granted.[1]

**I. Standard of Review**

In deciding a motion to dismiss, the district court is required to view the complaint in the light most favorable to the plaintiff. See Murphy v. Federal Deposit Ins. Corp., 208 F.3d 959, 962 (11th Cir. 2000)(citing Kirby v. Siegelman, 195 F.3d 1285, 1289 (11th Cir. 1999)). The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which she bases her claim. Instead, Rule 8(a)(2) requires a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544,

---

[1] Defendant also seeks leave to file a reply (Doc. No. 72), but the Court finds that a reply brief is not necessary.

555 (2007)(citation omitted).  As such, a plaintiff is required to allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (citation omitted).  While the Court must assume that all of the allegations in the complaint are true, dismissal is appropriate if the allegations do not "raise [the plaintiff's] right to relief above the speculative level." Id. (citation omitted).  The standard on a 12(b)(6) motion is not whether the plaintiff will ultimately prevail in his or her theories, but whether the allegations are sufficient to allow the plaintiff to conduct discovery in an attempt to prove the allegations. See Jackam v. Hospital Corp. of Am. Mideast, Ltd., 800 F.2d 1577, 1579 (11th Cir. 1986).

## II.  Background

Plaintiff-Relator Hilda Bulku ("Relator") alleges the following in her third amended complaint (Doc. No. 67): Relator is a Certified Public Accountant who was employed by Defendant Lincare Holdings, Inc. as a Senior Financial Analyst within its Corporate Accounting Department from March 23, 2015 through May 27, 2016.  Lincare is a national healthcare corporation that provides oxygen, respiratory and home infusion products and services to patients suffering from respiratory diseases.  Relator contends that Lincare violated the False Claims Act ("FCA") by overbilling and then failing to repay millions of dollars in overpayments from Medicare, Medicaid, and TRICARE.  As set forth below, the Court summarizes Relator's allegations (viewed in the light most favorable to her) while also pointing out certain problems with the sufficiency of her allegations.  The Court notes that Relator's allegations relating to her FCA claims must be pled with particularity, as required by Federal Rule of Civil Procedure 9(b).[2]  See U.S. ex rel. Mastej v. Health Management Associates, Inc., 591 Fed. Appx. 693, 703 (11th Cir. 2014).

---

[2] Relator agrees that both her reverse false claim and conspiracy claim, brought under the FCA, are subject to Rule 9(b)'s stricter pleading standard.

Relator contends that Lincare wrongfully retained millions of dollars in government overpayments that mainly resulted from two types of overbilling. First, Lincare failed to update its product price tables, which caused Lincare to repeatedly overcharge federal healthcare programs. Second, Lincare billed Medicare monthly rental amounts for oxygen equipment beyond the 36-month rental cap imposed by law.

### A. Price Tables

Relator contends that when billing the government, Lincare's billing system automatically records the government payer's allowable amount (based on the payer price table in Lincare's system) as revenue and accounts receivable. (Doc. No. 67-2). When the government payers' allowable amounts change, Lincare updates its price tables in two ways. First, Lincare's price tables are updated when a payer publishes their fee schedule and/or notifies Lincare of price changes. (Doc. No. 67-2). Second, if a payer's payment does not match the amount billed, then the discrepancy is researched and the payer's price table in Lincare's system is updated if the discrepancy resulted from incorrect pricing by Lincare. (Doc. No. 67-2). Relator contends that government overpayments resulted from Lincare's failure to update its product price tables, which caused Lincare to repeatedly overcharge federal healthcare programs.

### B. 36-Month Rental Cap

Relator contends that overpayments also resulted from Lincare billing Medicare monthly rental amounts for oxygen equipment beyond the 36-month rental cap, which was imposed by law in 2006. Relator contends that in an audit report for the 2015 fiscal year, KPMG raised the issue of the 36-month rental cap. Relator contends that Lincare had for years continued to bill Medicare beyond the 36-month cap after the 2006 change in the law and that many of these claims were not rejected by Medicare and were paid. (Doc. No. 67, ¶ 34). Relator contends that

even after KPMG identified the billing error and Lincare reversed the billed amounts in its financial records, the overpayments associated with these billing errors were never repaid.

Relator contends that after the KPMG audit report was issued, she approached Lincare Controller John Gonska (under whose direction she worked) and asked whether Lincare should make more of an effort to track payments, write-offs and refunds related to the oxygen rental cap so that Lincare would have a more accurate financial record. (Doc. No. 67, ¶ 35). In response, Gonska stated: "'Then you run into billing issues and we don't want that,' signifying to Relator that Gonska was fully aware of Lincare's intentional practice of billing Medicare beyond the 36 month cap, but did not want to change the current practice or reveal what Lincare was doing to KPMG." (Doc. No. 67, ¶ 35).

### C. Recognizing Overpayments as Revenue

Relator contends that at some point after Lincare received overpayments, Lincare recorded 2/3 of each overpayment as revenue. This was done by increasing revenue through a credit write-on adjusting transaction, using code 220-84. Transaction Code 220 signifies a sales adjustment, and Reason Code 84 signifies a credit write-on. (Doc. No. 67, ¶ 38). Relator points to Exhibits E and J (attached to the third amended complaint) to corroborate her contention that large credit write-on adjusting transactions were made.[3]

Relator contends that Lincare recorded the other 1/3 of each overpayment in a bad debt reserves account. This was done through an adjusting transaction that increased bad debt reserves, using code 242-69, in case the government inquired about its overpayment.

---

[3] Exhibit E shows adjustments made to sales (revenue) based on Reason Codes for each month in 2015. (Doc. No. 67-5). Reason Code 84 for Credit Write-ons, as explained above, reflects an increase to sales (revenue), and amounts for Credit Write-ons are shown as positive numbers on Exhibit E. Relator explains that Reason Code 83 for Medicaid Overpayments reflects overpayments that Medicaid flagged, and thus, those amounts are shown as negative numbers on Exhibit E, as those amounts reduce sales (revenue).

Transaction Code 242 signifies a sales adjustment posted to the bad debt reserve account, and Reason Code 69 signifies a credit adjustment to bad debts. (Doc. No. 67, ¶ 40). Relator points to Exhibit J to corroborate her contention regarding this adjusting transaction used to record the 2/3 revenue 1/3 bad debt reserves split.[4]

### D. Exhibits C, H, and I

In order to corroborate her allegations that Lincare wrongfully retained government overpayments, Relator points to certain financial records attached to her third amended complaint. Exhibit C is a Lincare financial document containing a summary of credits for different payers, grouped by region. (Doc. No. 67-3). It is titled, "Summary of Credits in AS400 AR." (Doc. No. 67-3).

Relator explains that overpayments show up as credits in Lincare's financial records. When a payer's payment exceeds the amount due in accounts receivable, the accounts receivable account will have a credit balance after the application of the payment. Relator then alleges the following:

> Consistent with this practice [of overpayments showing up as credits in Lincare's financial records], the "Summary of Credits" spreadsheet represented in Exhibit C was created by the Lincare Accounting Department for the sole purpose of summarizing overpayments received by Lincare from all payers. Payer overpayments thus are the only "Credits" that are referenced in this document. Relator has personal knowledge of this fact based on her prior position in Lincare's Accounting Department charging her with ensuring the accuracy and regular maintenance of all Lincare accounts . . . and also from conversations with Lincare personnel, including Controller John Gonska, who personally confirmed that overpayments from payers were accounted for in this manner.

---

[4] Relator fails to specify when these adjusting transactions were made (*i.e.,* how long after receipt of the overpayment did Lincare hold the overpayment in its accounts receivables before doing the 2/3 sales 1/3 bad debt reserves adjusting transaction). The adjusting transaction would consist of removing the overpayment from accounts receivable by debiting the accounts receivable account and crediting the revenue account by 2/3 of the overpayment and the bad debt reserves account by 1/3 of the overpayment.

5

(Doc. No. 67, ¶ 37). Thus, Exhibit C is a spreadsheet reflecting all payers that had a credit balance in their accounts receivable accounts, and according to Relator, the credit balances arose solely from payer overpayments.[5]

Relator points out that Exhibit C's spreadsheet reflects large overpayment balances existing every quarter from both government[6] and non-government payers.[7] Relator also attaches Exhibit H, titled "13 Month Credit Aging," to her third amended complaint. (Doc. No. 67-8). The total amount of credit balances in accounts receivables set forth in Exhibit H matches the total amount of credit balances in accounts receivables reflected in Exhibit C for each quarter. Thus, read together, along with Relator's allegation that all credit balances in accounts

---

[5] In its hearing brief and at the hearing, Lincare agreed that Exhibit C is a spreadsheet reflecting accounts receivables with credit balances. The parties disagree as to the cause of the credit balances. Relator contends that all of the credit balances arise solely from overpayments made to Lincare. Lincare contends that credit balances can result in a number of ways, in addition to overpayments, including: (1) a payer denied owing the money, Lincare disputed the denial but wrote the invoice off in accounts receivable, and the payer later paid the invoice (due to a change in position or due to Lincare winning an appeal of the denial); (2) Lincare underbilling payers due to incorrect price tables, and the payers paying the correct, larger amounts; and (3) clerical errors by Lincare when applying payments to accounts receivables. Lincare further explains that while all overpayments are credits to accounts receivables, not all credits in accounts receivable result from overpayments of money not owed to Lincare. Instead, a credit balance in accounts receivables reflects that Lincare received payments of amounts totaling more than the total amount that Lincare had recorded in its accounts receivables. However, as this is a motion to dismiss, the Court must accept Relator's allegation that all of the credits on Exhibit C resulted solely from overpayments, even if that allegation is highly unlikely.

[6] Exhibit C lists four types of payers: (1) Medicare, (2) Medicaid/Other (which Relator contends includes TRICARE), (3) Private Insurers (which Relator contends includes Medicare Advantage, because Medicare Advantage plans are managed by private insurance companies), and (4) Customers. Thus, Relator contends that government overpayments are the only overpayments reflected in the Medicare and Medicaid/Other columns and that government overpayments are included within the private insurance columns.

[7] Not all of the overpayment balances listed on Exhibit C differentiate between government and non-government payers. (Doc. No. 67-3). The top 80% of the page differentiates the payers, but the bottom 20% of the page sets forth overpayments from "Offline Billing Systems" and does not differentiate between government and non-government payers. It is the total of both portions (the overpayments set forth in the top 80% of the page and the overpayments from "Offline Billing Systems") that ties into the overpayment amounts set forth in Exhibit H's aging credits report (Doc. No. 67-8).

receivable resulted from overpayments, Exhibits C and H appear to corroborate Relator's contention that Lincare received overpayments from government payers.

Exhibit H is an "aged credits" report, which shows credit balances in accounts receivable accounts on a monthly basis, from March 2015 through March 2016. Within each month, the total balance for all payers' accounts receivable accounts for that month is broken into time periods—current month, 30 days, 60 days, 90 days, 120 days, 150 days, 180 days, 360 days, and 720 days. Relator contends that the aged credits report shows how long all payer overpayments (both government and non-government payers, combined) have been retained by Lincare in its accounts receivable accounts. (Doc. No. 67, ¶ 43). This allegation, however, conflicts with the contents of the exhibit itself, and when an allegation and an exhibit conflict, the exhibit controls. See Hoefling v. City of Miami, 811 F.3d 1271, 1277 (11th Cir. 2016).

The conflict between Exhibit H and Relator's allegation—that the aged credit report shows how long overpayments had been held by Lincare in its accounts receivable accounts—can be seen in the following example. Based on Exhibit H, in August 2015, there was $2,607,500 in the "150 days" column. According to Relator, the exhibit shows that by August 2015, Lincare had held $2,607,500 of overpayments for at least 150 days—meaning that Lincare had held the $2,607,500 since March of 2015. If that is what the exhibit shows, then in July of 2015, the exhibit would show at least[8] $2,607,500 in the 120 day column.[9] Stated differently, if Lincare had held $2,607,500 in overpayments for 150 days by August 2015, then 30 days

---

[8] It would be possible for Exhibit H to reflect more than $2,607,500 in 120 day column for July of 2015, because the credit balances can decrease over time due to refunds or the adjusting transaction to remove the credit balance from accounts receivable and record the amount into revenue and bad debt reserves,

[9] Furthermore, Exhibit H would also show at least $2,607,500 in the following columns: (1) the 90 day column for June of 2015; (2) the 60 day column for May of 2015; (3) the 30 day column for April of 2015; and (4) the current month column for March of 2015. None of these columns show at least $2,607,500.

earlier—July 2015—Lincare would have held the $2,607,500 for 120 days. However, in July 2015, Lincare only had $941,300 in its 120 day column.[10]

Lincare presented that example at the hearing, and the Court asked Relator to explain how Lincare could have held $2,607,500 for 150 days by August 2015, but it did not hold at least that amount 30 days earlier according to the 120 day column of Exhibit H for July 2015. Relator tried to explain by stating that the amounts in Exhibit H change based on when Lincare did the adjusting transaction to record 2/3 of the overpayment as revenue and to record 1/3 of the overpayment in the bad debt reserves account. However, the effect of the adjusting transaction is to *reduce* the credit balance in accounts receivable; the adjusting transaction cannot be the cause of the *increasing* credit balance in accounts receivable.[11]

Thus, Exhibit H flatly contradicts Relator's contention that the aged credits report shows *how long Lincare retained* payer overpayments. Additionally, there is no dispute that the aged credits report does not distinguish between government and non-government payers, and as such, Exhibit H does not help Relator allege, with the required particularity, that Lincare retained *government* overpayments for any particular period of time.

Relator also relies on Exhibit I, which is a portion of a Trial Balance for the period ending December 31, 2015. (Doc. No. 67-9). Based on Exhibit I, Relator makes the following allegation:

> [Exhibit I] reflects that as of November 30, 2015, Lincare showed a balance of only about $3.8 million in refunds to all payers, far less

---

[10] This is only one of many examples of how the amounts in the period/column of Exhibit H's aged credits report often greatly increase over time.

[11] Lincare contends that the reason that the credit balances in Exhibit H increase over time is because the aged credits report shows how long ago the invoices corresponding to the overpayments creating the credit balances were issued. The Court does not rely on Lincare's explanation as a basis for rejecting Relator's allegation that the aged credits report reflects how long Lincare held overpayments. Exhibit H, itself, conflicts with Relator's allegation, and this is the sole basis for the Court's rejection of Relator's allegation on this issue.

> than the more than . . . $9 million in overpayments existing as of September 2015 (reflected in Exhibit C) . . . or the more than $16 million in aged overpayments existing as of March 2016 (reflected in Exhibit H).

(Doc. No. 67, ¶ 44). The flaws with this allegation are numerous.

First, the $9 million in overpayments reflected in Exhibit C for September of 2015 consist of both government and non-government overpayments. The only columns on Exhibit C that appear to include only government payers are the "Medicare" and "Medicaid/Other" columns. The total of those two columns in Exhibit C in September of 2015 is approximately $2.6 million (which is less than the $3.8 million balance for refunds reflected in Exhibit I as of November 30, 2015).[12]

Second, the more than $16 million in total credits reflected on Exhibit H for March of 2016 is the amount for both government and non-government payers combined. Instead, one would look to Exhibit C to find a breakdown of credit balances for government and non-government payers. The amount of government credit balances reflected in the "Medicare" and "Medicaid/Other" columns of Exhibit C in March of 2016 is approximately $3 million. It is unclear why Relator would compare the refund balances in November 2015 to the credit balances in accounts receivable accounts in March of 2016.

Third, Exhibit I merely shows the amount of refunds that Lincare recognized that it owed on two specific dates—on the unspecified beginning date (which Relator contends is November 30, 2015) and on December 31, 2015. Exhibit I does not purport to show the amount of refunds that Lincare actually made during that time. Stated differently, during that purported one month period, Lincare could have recognized that it owed an additional amount (for example, $10

---

[12] The Court assumes that Relator is comparing the credits in September of 2015 to the refund balance in November of 2015, because Relator contends that overpayments received in September would need to be refunded by November.

million) and also refunded a total of $10 million, and the net effect of the recognition and refunding would be zero and would not be reflected in the two refund accounts (manual and automated) in the Trial Balance excerpt.

Fourth, even if the Court accepts Relator's contention that the Trial Balance excerpt shows the amount of refunds that Lincare recognized that it owed at the end of November 2015, the Trial Balance excerpt does not show *how long Lincare retained government overpayments*. Furthermore, the Trial Balance excerpt does not even distinguish between government and non-government refunds.

### E.  Bases for Relator's Contentions

Relator acknowledges that she did not process individual claims and did not have access to claim level details.  Instead, she contends that based on her position at Lincare, she has personal knowledge of the accounting practices and entries proving Lincare's fraudulent retention of overpayments.  Additionally, she contends that two former Lincare employees independently confirmed to Relator that Lincare received and wrongfully retained government overpayments.

First, Relator contends that on August 25, 2015, she had a phone conversation with Kay Skelton, a recently retired Lincare Financial Reporting Manager that Relator had been hired to replace.  Relator discussed the 2/3 revenue 1/3 bad debt reserves adjustment for overpayments and asked Skelton why there were so many credit write-ons and whether it was just a reporting error.  According to Relator, "Skelton confirmed to Relator that the 'write-ons' were overpayments from payers, even claiming that Lincare had tried to return the government overpayments without success."  (Doc. No. 67, ¶ 47).

Second, Relator contends that on October 5, 2016, she spoke to Linda Ryan, a longtime Lincare employee that worked at Lincare in its billing and compliance departments for over 20

10

years before leaving in June of 2016. Relator contends that Ryan confirmed that Lincare received and wrongfully retained government overpayments and that employees raising the issue had either been reprimanded or dismissed.

### F. Relator's Termination

Relator repeatedly objected to Lincare's senior leadership concerning the allegedly fraudulent retention of overpayments. Specifically, she spoke with Jochen Straub (Head of Accounting and Controlling), Joseph Hamilton (Internal Control Manager), John Gonska (Lincare's Controller), and Crispin Teufel (Lincare's CFO). In November of 2015, Relator escalated her complaints to Lincare's Human Resources Department and spoke with Paula Adams, Lincare's Employee Relations Director.

Lincare took no action to investigate her complaints, and Lincare became hostile towards Relator. By May of 2016, Lincare terminated Relator's employment. The termination letter stated that her termination was due to her work performance, but Relator believes that she was terminated in retaliation for her continued objections to Lincare's allegedly fraudulent retention of overpayments.

### G. Relator's Claims

As a result of the above, Relator filed this lawsuit on behalf of the Government and herself and now asserts four claims.[13] In Counts I-III, she asserts that Lincare violated the FCA. Specifically, in Count I, she asserts that Lincare violated 31 U.S.C. § 3729(a)(1)(G), thus asserting a reverse false claim. In Count II, she asserts that Lincare engaged in a conspiracy in violation of 31 U.S.C. §3729(a)(1)(C). In Count III, she asserts that Lincare retaliated against

---

[13] The Government has decided not to intervene in this case. (Doc. No. 18).

her in violation of 31 U.S.C. §3730(h).  In Count IV, she asserts a claim under Florida's Whistleblower Act.  In response, Lincare moves to dismiss Counts I, II, and IV.[14]

### III.  Motion to Dismiss

In the instant motion, Lincare moves for dismissal, arguing that Counts I, II, and IV are not sufficiently pled.  In moving for dismissal, Lincare points out that the FCA claims asserted in Counts I and II must be pled with particularity, because Federal Rule of Civil Procedure 9(b) applies to FCA fraud claims.  See Mastej, 591 Fed. Appx. at 703.  This heightened pleading standard in the context of FCA claims requires the following:

> An FCA complaint must therefore "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." An FCA complaint "satisfies Rule 9(b) if it sets forth facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." . . . [Courts] evaluate[] "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis."

Id. at 703-04 (internal citations omitted).  "Rule 9(b) ensures that the relator's strong financial incentive to bring an FCA claim—the possibility of recovering between fifteen and thirty percent of a treble damages award—does not precipitate the filing of frivolous suits."  See U.S. ex rel. Atkins v. McInteer, 470 F.3d 1350, 1360 (11th Cir. 2006).  Accordingly, the Court will analyze the sufficiency of the allegations for each of the challenged counts.

---

[14] The Court has previously found that Relator has sufficiently stated her retaliation claim.  (Doc. No. 66).

**A.  Count I – Reverse False Claim**

In Count I, Relator contends that Lincare violated 31 U.S.C. § 3729(a)(1)(G), which makes it unlawful to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the government.  This is known as a reverse false claim.  The statute specifies that its prohibition includes knowingly and improperly retaining an overpayment.  31 U.S.C. § 3729(b)(3) (stating that the term, obligation, includes "the retention of any overpayment").

The Affordable Care Act of 2010 "provides that any person who has received an overpayment from Medicare or Medicaid and knowingly fails to report and return it within sixty days after the date on which it was identified has violated the FCA."  Kane ex rel. U.S. v. Healthfirst, Inc., 120 F. Supp.3d 370, 381 (S.D.N.Y. 2015)(citing 42 U.S.C. § 1320a-7k(d)).  An overpayment is defined as funds that a person receives to which the person is not entitled.  42 U.S.C. § 1320a-7k(d)(4)(B).  Relator contends that Lincare violated the reverse false claim provision of the FCA by retaining government overpayments for more than 60 days after their identification.

Lincare moves to dismiss this claim, arguing that Relator has not sufficiently alleged that overpayments were made by the government, nor has she sufficiently alleged that Lincare knowingly and improperly retained any government overpayment for more than 60 days after its identification.  As explained below, the Court agrees with Lincare that Relator's reverse false claim count fails.

Construing the complaint in the light most favorable to Relator, the Court finds that she has alleged, consistent with Rule 8(a), that overpayments were made by the government.  Relator has alleged that all credit balances in accounts receivable resulted from overpayments, and Exhibit C shows credit balances in accounts receivable for government payers.  However, she

has not alleged with sufficient particularity, consistent with Rule 9(b), the factual basis for her assertion that all credit balances in accounts receivable resulted solely from overpayments. See, e.g., U.S. ex rel. Yannacopoulos v. General Dynamics, 636 F.Supp.2d 739, 753 (N.D. Ill. 2009)(rejecting the argument that "the maintenance of a general ledger account is an acknowledgment of a debt sufficient to form an obligation under the FCA"). Relator does not identify even one specific overpayment made by the government, nor has she alleged specific facts for any overpayment to show that the payment consisted of funds to which Lincare was not entitled.

Furthermore, Relator has not alleged, with sufficient particularity, that Lincare knowingly and improperly *retained* government overpayments for more than 60 days. In support of her contention that Lincare retained government overpayments for more than 60 days, Relator relies on Exhibit H's aged credits report and contends that it shows that Lincare retained government overpayments for up to 720 days. The Court has previously pointed out the two flaws in this argument. First, the aged credits report combines both government and non-government payers' credit balances, and as such, does not address the retention of *government* overpayments with particularity. Second, the aged credits report does not show *how long Lincare retained* overpayments. Accordingly, there are not sufficient allegations before the Court, stated with particularity, that Lincare retained government overpayments for any particular period of time.

To be clear, Relator has not provided specific factual allegations for even one specific payment by the government (or that such payment was for more than the amount for which Lincare was entitled), much less has she provided specific factual allegations showing that Lincare retained the specific overpayment for more than 60 days. Thus, Relator has not stated a reverse false claim with sufficient particularity.

The Court notes Relator's attempt to bolster her allegations and create an additional "indicia of reliability" by asserting in the complaint that two former Lincare employees confirmed that Lincare received and wrongfully retained government overpayments and that employees raising the issue had either been reprimanded or dismissed. These allegations from other employees do not add sufficient detail regarding Lincare's alleged retention of government overpayments to create an "indicia of reliability" to support her claim.

Based on the above, the Court finds Relator's allegations regarding Lincare's retention of government overpayments to be general and conclusory at best. Relator does not provide the level of detail required by the Eleventh Circuit to sufficiently allege an FCA violation with particularity. Accordingly, the Court grants Lincare's motion to dismiss the Reverse False Claim in Count I.

### B.  § 3729(a)(1)(C)—the Conspiracy Claim

In Count II, Relator contends that Lincare violated 31 U.S.C. §3729(a)(1)(C), which makes it unlawful to conspire to commit a violation of 31 U.S.C. §3729(a)(1). In order "[t]o state a claim of conspiracy to violate the False Claims Act, the plaintiff must allege (1) an unlawful agreement between defendants to commit a violation of § 3729(a)(1); [and] (2) an act performed in furtherance of the conspiracy." United States v. HPC Healthcare, Inc., 723 Fed. Appx. 783, 791 (11th Cir. 2018).[15] "Rule 9(b)'s heightened pleading standard applies to claims brought under the conspiracy provision." Id.

---

[15] The court in HPC Healthcare, Inc. stated that it is not clear whether damages to the government remain an element of a conspiracy claim following FERA's amendments to § 3729(a)(1). See HPC Healthcare, Inc., 723 Fed. Appx. at 791 n.4.

Lincare moves to dismiss this claim, arguing that Relator has not sufficiently pled it. Lincare argues that Relator fails to allege the specific facts necessary to show that an agreement to violate the FCA was made, and she fails to allege an overt act in furtherance of the conspiracy.

Relator responds that Lincare's Controller and CFO were involved in the conspiracy. Relator's allegations regarding Lincare's Controller, John Gonska, are scant and fail to show that he was involved in a conspiracy to violate the FCA. Likewise, Relator's allegations regarding Lincare's CFO, Crispin Teufel, consist of three sentences, in which Relator alleges that she had raised her concerns regarding the retention of overpayments to Teufel and that he denied that Lincare was keeping overpayments. (Doc. No. 67, ¶ 48-49, 53).

Relator also contends that former employee Linda Ryan's statement that employees were disciplined for raising concerns about the retention of overpayments supports Relator's claim that there was a conspiracy to violate the FCA. Ryan does not identify who allegedly took the disciplinary actions against the employees, nor does her statement show that an agreement to violate the FCA existed.

Based on the above, the Court agrees with Lincare that Relator has failed to sufficiently allege an unlawful agreement or an overt act even under the more liberal pleading standard of Rule 8(a). Accordingly, the Court grants Lincare's motion to dismiss the conspiracy claim in Count II.

### C.  Florida Statute § 448.102—the Florida Whistleblower Claim

In Count IV, Relator contends that Lincare violated Florida Statute § 448.102(3). That section of the Florida Whistleblower Act ("FWA") prohibits an employer from taking a retaliatory personnel action against an employee that has "[o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3). Lincare argues that this claim must be dismissed, because

Relator has not shown that she reported an *actual* (as opposed to suspected) FCA violation.  See White v. Purdue Pharma, Inc., 369 F. Supp.2d 1335, 1337, 1338 (M.D. Fla. 2005).  In support of this contention, Lincare argues that Relator's FCA claim in Counts I fails, and therefore, there is no basis for the conclusion that Relator reported an actual FCA violation to Lincare.

Relator responds that she has sufficiently stated a claim for an actual FCA violation, which forms the basis of her FWA claim.  However, as the Court has found that Relator has not sufficiently alleged a reverse false claim under the FCA, her reports of a suspected FCA violation cannot support her FWA claim.  Accordingly, the Court grants Lincare's motion to dismiss the FWA claim in Count IV.

## IV.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1) Defendant's Motion to Dismiss (Doc. No. 68) is **GRANTED**, and the Court dismisses Counts I (reverse false claim), II (conspiracy), and IV (FWA).

(2) Defendant's Motion for Leave to Reply (Doc. No. 72) is **DENIED**.

(3) Defendant is directed to file an answer to Count III of the third amended complaint (retaliation) by December 3, 2020, and the stay on discovery (Doc. No. 65) is now lifted.

DONE AND ORDERED at Tampa, Florida, this 19th day of November, 2020.

SUSAN C. BUCKLEW
United States District Judge

Copies to: Counsel of Record